UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| BIG BEN INC., a New York Corporation and SHMUEL EINHORN | : : | |
| Plaintiffs, | : : | Docket No. |
| - against - | : : | |
| KAPITUS SERVICING INC., a Virginia Corporation SANDORA CAPITAL LLC, ALBERT MALAH, MICHAEL CARLSON, BENJAMIN JOHNSTON, ANDREW REISER, ANTHONY ROSE, ABC CORPORATIONS 1-5, and JOHN DOES 1-5, | : : : : : : | COMPLAINT |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

COMES NOW, Plaintiffs BIG BEN INC., a New York Corporation and SHMUEL EINHORN, through legal counsel, SCOTT LEVENSON, ESQ., LEVENSON LAW GROUP, and amends the Complaint in this action as a matter of right based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of their attorneys.

**PARTIES**

1. Plaintiff, Big Ben Inc., is a New York Corporation with addresses at 5 Satmar Dr. Unit 101 Monroe, NY 10950.

2. Plaintiff Shmuel Einhorn is a New York residence with addresses at 5 Satmar Dr. Unit 101 Monroe, NY 10950.

3. Defendant Kapitus Servicing Inc. ("Kapitus") is a Virginia Corporation with a registered address of 100 SHOCKOE SLIP, 2ND FLOOR, RICHMOND, VA, 23219.

4. Defendant Sandora Capital LLC ("Sandora") is a New York Limited Liability Company with a service of process address 295 AVENUE O, BROOKLYN, NY, UNITED STATES, 11230.

5. Defendant Albert Malah is believed to be a New York resident and is an agent of Sandora Capital LLC with an office address of 295 AVENUE O, BROOKLYN, NY, UNITED STATES, 11230.

6. Michael Carlson is believed to be a Virginia Resident and is also believed to be a shareholder and on the board of directors for Kapitus Servicing Inc., with an office address of 2500 Wilson Blvd Ste 350, Arlington, VA, 22201, USA.

7. Benjamin Johnston is believed to be a Virginia Resident and is also believed to be a shareholder and on the board of directors for Kapitus Servicing Inc., with an office address of 2500 Wilson Blvd Ste 350, Arlington, VA, 22201, USA.

8. Andrew Reiser is believed to be a Virginia Resident and is also believed to be a shareholder and on the board of directors for Kapitus Servicing Inc., with an office address of 2500 Wilson Blvd Ste 350, Arlington, VA, 22201, USA.

9. Anthony Rose is believed to be a Virginia Resident and is also believed to be a shareholder and on the board of directors for Kapitus Servicing Inc., with an office address of 2500 Wilson Blvd Ste 350, Arlington, VA, 22201, USA.

10. ABC Corporations 1-5 are unknown business entities who participated in and/or benefited from the execution and enforcement of the underlying Agreement.

11. John or Jane Does 1-10 are unknown persons who participate in and/or benefited from the execution and enforcement of the underlying Agreement.

**JURISDICTION AND VENUE**

12. The Court has personal jurisdiction over all Defendants because Plaintiffs' claims arise out of the business activities of those Defendants conducted in the State of New York.

13. The Court has subject matter jurisdiction over the matter as the Complaint alleges causes of action that raise a federal question as to the laws of the United States pursuant to 28 U.S. Code § 1331.

14. Venue is proper because Defendants conduct a significant amount of business in this district and because Defendants have substantial contacts in this District.

## FACTUAL BACKGROUND

1. In early February, Plaintiffs met with Albert Malah, Senior Underwriter for Sandora, about the possibility of obtaining a loan for Big Ben's business. Albert Malah put Plaintiffs in touch with Kapitus.

2. On or about February 24, 2022, Plaintiffs entered into an Agreement for a loan from Kapitus Servicing Inc. ("Kapitus") (the "Agreement") and Shmuel Einhorn was required to be a guarantor of this Agreement.

3. The loan was framed as a purchase of receivables valued at an amount of $138,000 and with a net purchase price of 97,5000 with a weekly payment amount of $2,656.00 equating to an effective interest rate of 41.53%. The Agreement also listed a Closing fee of 2.5% or $2,500. In addition, the Agreement lists fees of $175 for a returned payment, $2,500 for a default fee, $75.00 for changing bank accounts, and a $50 Banking Fee if payments are made through wire or check.

4. The Agreement received is attached as **Exhibit 1.**

5. As part of the Agreement, paragraph 8, Plaintiffs were entitled to seek a reconciliation of the accounts to be certain the payments were based off of actual account receivables and were entitled to an adjustment to the specified amount. The Agreement states,

> "The Specified Amount shall be reconciled to reflect the Seller's actual Receipts at Seller's request. Seller may initiate a reconciliation by calling 1-800-780-7133 and requesting to speak with a Kapitus Servicing, Inc. ("Servicer") customer service representative. The Seller agrees to provide any information needed to complete such reconciliation, including providing online access to Seller's banking transaction data through a secure, read-only link. It is the Seller's responsibility to provide bank transaction data and/or statements for any and all bank accounts held by the Seller to reconcile the ACH debits to the Specified Percentage permitting Servicer to debit or credit the difference to the Seller. Upon verification of the Receipts generated by Seller, Servicer shall adjust the Specified Amount on a going-forward basis to more closely reflect the Seller's actual Receipts."

6. On May 13, 2022, while not in default, Plaintiffs contacted Kapitus at the provided number and sent a written request via the email address provided by Defendant requesting a reconciliation as the amounts counted as receivables were not accurate and Plaintiff sought an adjustment to the specified amount attached as **Exhibit 2**.

7. On May 20, 2022, Plaintiff received an email from Defendant that was not a reconciliation, but rather an unfounded blanket statement which read, "Our underwriting team has reviewed Mr. Einhorn's statements and has determined that Mr. Einhorn is not entitled to a refund as Kapitus debits less than 2.7% for the month of April. Mr. Einhorn's total revenue in April was $418,683.00, 2.7% of the revenue would come to $11,305. Total debits by Kapitus were $10,642 which is less than 2.7."

8. Plaintiff, through counsel, replied to Defendant, informing them that the request was for an actual reconciliation that demonstrated the reasons that Plaintiff was not entitled to a

refund. Additionally, Plaintiff's counsel informed Kapitus that the amounts listed as receivables were actually transactions from family and friends funding the business rather than actual receivables as no goods were provided and Plaintiff gave information and statements demonstrating such attached as **Exhibit 3.**

9. Defendants maintain their position that they will not reconcile the accounts nor provide a refund the specified amount.

## COUNT ONE- BREACH OF CONTRACT AS TO DEFENDANT KAPITAS

10. Plaintiffs incorporate by reference Paragraphs 1 through 9 as if more fully set forth herein.

11. Plaintiffs had fulfilled their obligations under the Agreement as of the date of their request for reconciliation.

12. Kapitus was required to fulfill their obligation, as stated in the Agreement, to provide Plaintiffs with a reconciliation and a potential adjustment to the remittance amount per the terms of the Agreement and did fulfill this obligation. Additionally, the amounts that were counted as receivables by Kapitus were not for goods and were not receivables. Kapitus still refused to reconcile despite having knowledge of this information.

13. Defendant Kapitus is in breach of contract and Plaintiffs therefore request specific performance and an order from this Court requiring Defendant Kapitus to provide reconciliation and an adjustment of the remittance amount if appropriate once reconciliation is complete. Plaintiffs are also entitled to attorney fees as well as any consequential damages.

## COUNT THREE AS TO KAPITUS- FRAUD

14. Plaintiffs incorporate by reference Paragraphs 1 through 13 as if more fully set forth herein.

15. The Agreement set forth sham fees chargeable to Plaintiffs including a "returned payment" fee of $175, a "default fee" of $2,500 (which would seem duplicative to the returned payment fee), a $75 fee for changing bank accounts, and a $50 fee for paying with a check.

16. Defendant Kapitus also improperly deducted an "Closing Fee" of $2,500. This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise of related expenses pertaining to origination.

17. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

18. The Agreement represented that these fees were for services or costs purportedly provided by or incurred by Cloudfund in connection with the Agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the Agreement and the so-called "fees" were nothing more than additional profits reaped by Cloudfund. The Agreement makes no specific mention of what services are provided for these fees.

19. Additionally, Defendant Kapitas took great steps to disguise this loan, with a criminally usurious rate, as a purchase of accounts receivables and in this way acted with malice in their attempts to cover up the true nature of the Agreement.

20. Kapitus knew that their representations concerning the nature and purpose of the

Agreement as well as the nature of the fees were false and misleading at the time they entered into the Agreement.

21. These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the Purchased Amount of the Agreement were legitimate fees charged to offset the costs of services provided by Kapitus.

22. The false representations were also made by Kapitus to induce Plaintiffs to enter into the Agreement believing that they had the ability to pay based off of actual receivables, rather than simply a loan with payments as was the case in reality. This is further evidenced by Kapitus' refusal to provide reconciliation to adjust the amount of remittance due under the Agreement.

23. Plaintiffs reasonably relied upon these representations in entering into the Agreement and, ultimately paying, the fees through the daily payments.

24. By reason of the foregoing, Plaintiffs are entitled to a judgment against Kapitus in the amount of fees charged to Plaintiffs by Kapitus, as well as a cancellation of the Agreement, and other consequential damages from Kapitus' fraudulent actions.

## COUNT THREE AS TO ALL DEFENDANTS- RICO 18 USC SECTION 1962

25. Plaintiffs incorporate by reference Paragraphs 1 through 24 as if more fully set forth herein.

**A. The Unlawful Activity**

26. More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

27. In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

28. As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

29. As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

30. This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

31. As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations. The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

32. Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

33. Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B. Culpable Persons.**

34. All Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

35. All individual Defendants are agents and/or owners of Cloudfund and the other corporate Defendants in this action.

**C. The Enterprise**.

36. Defendants, and their Investors, constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

37. The Enterprise and its Investors are associated in fact through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states which benefits Cloudfund.

38. On an ongoing basis, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States and engaging in deceitful and threatening tactics to collect on them.

39. The debt, including such debt evidenced by the Agreement, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than seven the legal rate permitted under New York Penal Law §190.40.

40. The members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements

relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

41. The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D. Interstate Commerce**

42. The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

43. Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

44. In the present case, communications between the members of the Enterprise, and Cloudfund were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreement and others, fund the advances under the Agreement and collect the payments via interstate electronic ACH debits.

**E. The Injury and Causation**

45. Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

46. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments. Plaintiffs were forced to make daily payments pursuant to the Agreement that amounted to unconscionable interest rates.

47. Under controlling New York law, the Agreement is void ab initio. Despite the documented form, the transaction is, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

    a. The Weekly Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

    b. The default and remedy provisions of the Agreement purported to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

    c. While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of

    the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

d. The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

e. The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

f. The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

g. The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the Agreement;

h. The Agreement required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and

      warranties constituted a default, which fully protected the Cloudfund from any risk of loss resulting from the merchant's failure to generate and collect receivables.

    i. Cloudfund further required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

48. N.Y. Penal Law § 190.40 provides that a loan is criminally usurious when the parties knowingly provided for an interest rate of 25% or more. A corporation may assert criminal usury as an affirmative defense to efforts to collect on a loan provided the interest rate is higher than the amount required to show criminal usury. *Adar Bays LLC v. GeneSYS ID, INC.*, 2021 NY Slip Op 05616 (2021) *citing* N.Y. Gen. Oblig. Law § 5-521; *see, e.g., Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring, Inc.*, 105 A.D.3d 178, 182, 961 N.Y.S.2d 86 (2013). "Loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays LLC v. GeneSYS ID, INC.*, 2021 NY Slip Op 05616 (2021).

49. The court in *Adar Bays* discussed the history of the usury laws in the courts and legislature explaining that the purpose was to deter lenders who are fully aware of the usury laws, particularly with regard to corporations, from taking advantage of those who are in weaker bargaining position. *Id. citing Schneider v Phelps,* 41 NY2d 238, 243 (1977).

50. The *Adar* decision stated, "Without doubt, New York's voiding of usurious contracts "can be harsh," perhaps especially in comparison to other states' laws, but the penalty reflects the legislature's consistent condemnation of the "evils of usury." *Adar citing Seidel v 18 E. 17th St. Owners*, 79 NY2d 735, 740-741 (1992). The forfeiture of interest and capital serves a strong deterrent effect - one the legislature has repeatedly affirmed." *Id.*

51. Additionally, Defendant's attempt to hide the actual rate of interest by labeling portions of it as fees must be included when determining the actual rate of interest that Plaintiff is required to pay. This longstanding trend of lenders attempting to hide interest was recognized by courts over one hundred years ago stating, "The shifts and devices of usurers to evade the statutes against usury have taken every shape and form that the wit of man could devise, but none have been allowed to prevail. Courts have been astute in getting at the true intent of the parties and giving effect to the statute." *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875).

52. Courts have recognized that "The guiding principle therefore is that "the transaction must be judged by its real character, rather than by the form and color which the parties have seen fit to give it." *Kredietbank v. ESIC Capital Corp. (In Re Rosner)* 48 B.R. 538, 548 (1985). *See also De Korwin v. First National Bank of Chicago*, 170 F.Supp. 112, 128 (N.D.Ill.1958), aff'd, 275 F.2d 755 (7th Cir.), cert. denied, 364 U.S. 824, 81 S.Ct. 61, 5 L.Ed.2d 53 (1960).

53. Therefore, the fees, including origination, administration and loan guaranty, should be calculated as interest when looking at the Agreement. *See also, Lugli*

*v. Johnston,* 78 A.D.3d 1133, 1133-1135, 912 N.Y.S.2d 108 (2d Dep't 2010).

54. The courts have further discussed that a corporation need not show specific intent to fulfill the requirements to show criminal usury, but rather where, "the interest payable [is] so large that, in view of all the circumstances, an intent to provide for the payment of interest beyond the legal rate will necessarily be imputed to them. *Fiedler v. Darrin*, 50 N.Y. 437 (1872); *Hartley v. Eagle Insurance Co*., 222 N.Y. 178, 187, 118 N.E. 622, 625.

55. Defendant in this case provided Plaintiffs with a contract that had an actual interest rate of 41.53% but disguised this amount with fees and veiled it as simply a purchase of accounts receivables.

56. Plaintiffs ask that this Court hold that the Agreement is usurious and therefore invalid. Defendants should be estopped from collecting any further amount, including principal, interest, fees, or other forms of payment from Plaintiffs.

57. Without said action from the Court, Plaintiffs will be irreparably harmed.

58. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

59. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**COUNT SIX AS TO ALL DEFENDANTS- CONSPIRACY 18 USC SECTION 1962(d).**

60. Plaintiffs incorporate by reference Paragraphs 1 through 104 as if more fully set forth herein.

61. Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

62. By and through each of the Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendant and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreement, Defendant knew the nature of the Enterprise and Defendant knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendant knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

63. Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreement.

64. Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

65. The participation and agreement of Defendant and each Enterprise Member was necessary to allow the commission of this scheme.

66. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at a hearing.

67. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, lost customers, loss of goodwill, and lost profits. Plaintiffs were forced to make daily payments pursuant to the Agreement that amounted to unconscionable interest rates.

68. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

69. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

WHEREFORE, Plaintiffs pray for judgment in their favor and respectfully request that this Court enter an order

1. Holding that the Defendants committed Fraud and award consequential damages;
2. Holding that Defendants have violated the Rico statutes;
3. Holding that Defendants have violated the conspiracy statutes;
4. Awarding Plaintiffs, actual, consequential, treble and punitive damages in an amount to be determined at trial;
5. Awarding Plaintiffs attorney fees and costs;

      6.  Such further relief as the Court deems just and proper.

Dated: November 10, 2022
New York, NY

                               Respectfully submitted,

                               s/*Scott Levenson Esq.*
                               Scott Levenson, Esq.
                               Levenson Law Group
                               625 W. 51st Street
                               New York, NY  10019
                               Tel: 347-352-2470
                               LevensonLawGroup@gmail.com
                               Attorneys for Plaintiffs